# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____

|  |  |  |
|---|---|---|
| COBRA TACTICAL, INC., KAT, LLC d/b/a | ) | |
| KA TACTICAL, and EULESS ARMORY, LLC | ) | |
| d/b/a ARMORY UP, individually and on behalf | ) | |
| of all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | NO. 1:17-cv-01827-MHC |
| PAYMENT ALLIANCE INTERNATIONAL | ) | |
| INC., GLOBAL PAYMENTS DIRECT, INC., | ) | |
| and CLEARENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## RESPONSE IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

E. Adam Webb, Esq.
Matthew C. Klase, Esq.
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773

*Counsel for Plaintiffs*

For years, Defendants have systematically and surreptitiously charged improper fees. If the parties' purported contract never took effect (because Defendants and their bank did not sign it), Plaintiffs seek recovery via unjust enrichment. Alternatively, if the contract took effect, Plaintiffs claim breach and attack the enforceability of buried exculpatory clauses. These claims and their underlying factual allegations are set forth in painstaking detail in the 176-paragraph Amended Complaint (Dkt. No. 13). Defendants do not take issue with the thoroughness of these allegations, but instead argue that the contract bars all claims. In support, Defendants ask this Court to interpret the agreement and analyze its effectiveness and enforceability – inquiries that are appropriately reserved for summary judgment. The notion that the Court should resolve these issues now without the benefit of discovery is untenable. Indeed, defense counsel, who often represent plaintiffs, have previously (and successfully) advocated that a court *must* await discovery before deciding whether similar contractual provisions are enforceable. The same rationale applies here and dismissal should be DENIED.

## **BACKGROUND**

Plaintiffs are merchants that sell firearms. Dkt. No. 13, ¶¶ 18-20. To stay competitive in the marketplace, they must accept payment via credit and debit cards and thus must utilize a payment processing service. *Id.* at ¶¶ 2-3. Plaintiffs

1

dealt with authorized agents of PAI who informed them that they could save substantial costs if they switched to PAI and its partner Global.[1]  *Id.* at ¶ 70. Plaintiffs and the PAI agents then proceeded to negotiate the fees Plaintiffs would pay for such services.  *Id.*  The agents presented Plaintiffs with Defendants' form Merchant Application which specifically identified the agreed-upon fees.  *Id.* at ¶ 71; *also* Applications (Dkt. Nos. 13-1 – 13-3).  Plaintiffs were satisfied with the pricing and decided to do business with Defendants.  Dkt. No. 13, ¶¶ 72-78.

The Application references a much larger, non-negotiable document, the "Card Services Terms and Conditions" ("Terms").[2]  Applications, p. 3; Terms (Dkt. No. 13-4).  Both the Application and the Terms provide that Defendants and their member bank must first "accept" the Application before it becomes effective. Dkt. No. 13, ¶ 43 (citing Application, p. 3 and Terms, § 24).  The only specified method of acceptance is signature.  *Id.* at ¶¶ 44 (citing Application, pp. 1, 3), 80. This signature requirement is reiterated throughout the Terms and also in the incorporated rules of the card networks.  *Id.* at ¶¶ 45-47.

Despite this express condition precedent, it is an undisputed fact that neither Defendants nor their member bank ever signed the Applications.  Dkt. No. 13, ¶¶

---

[1] Defendant Clearent is PAI's successor.  Dkt. No. 13, ¶¶ 22-23.
[2] Collectively, the Application and Terms are referred to herein as "the contract" or "the agreement."

52, 81-85.  Thus, the contracts never took effect.[3]

Over the course of their relationship, Defendants implemented their scheme to impose excessive fees.  *Id.* at ¶ 87.  These fee manipulations generally fall into four categories:  (a) inflation of card network fees that were supposed to be "passed through" at cost (*id.* at ¶ 88(a)-(c)); (b) inflation of rates applicable to "non-qualified" transactions (*id.* at ¶ 89); (c) inflation of "junk fees" set forth in the Applications (*id.* at ¶ 90(a)-(c)); and (d) imposition of new "junk fees" that were not disclosed at the commencement of the relationship (*id.* at ¶ 91(a)-(c)).  Plaintiffs all suffered from Defendants' scheme.  *Id.* at ¶¶ 88-91.

Defendants took steps to conceal their overbilling.  For example, they (a) failed to send monthly statements (*id.* at ¶¶ 92, 98); (b) seized the fees from

---

[3] Defendants argue that Plaintiffs' claim that the contract never took effect is "a 180-degree deviation" from the original Complaint, which alleged that a contract had been formed.  Dkt. No. 24-1, p. 1.  Defendants claim this "flip-flop" was a "strategic shift" to avoid the impact of the written notice and class waiver provisions set forth in the Terms.  *Id.* at 2-3.  But Plaintiffs took these provisions head on in the original Complaint (Dkt. No. 1-1, ¶¶ 47, 70-72) and continue to do so in the Amended Complaint.  Moreover, as this Court is well aware, counsel for Plaintiffs have been attacking the enforceability of *verbatim* exculpatory provisions in another case for more than a year.  *E.g.*, *Champs Sports Bar & Grill Co. v. Mercury Payment Systems, LLC*, Case No. 1:16-cv-12-MHC (N.D. Ga.) (Dkt. Nos. 22, 22-5, 42).  Defendants' speculation that Plaintiffs "invented" the argument that the contract never became effective to avoid addressing the exculpatory terms is unfounded and false.  In reality, Plaintiffs added the claim when they became aware of the fact that ***Defendants never signed*** the Applications, which was ***after*** the Complaint was filed when Defendants filed the unsigned applications with the Court.  Dkt. No. 13, ¶ 82.  Thus, the amendment was justified and appropriate.

merchant accounts before merchants received statements and had a reasonable opportunity to understand what they had been billed (*id.* at ¶ 99); (c) formatted the statements to make it difficult for merchants to determine whether they were being overbilled, such as by lumping "pass through" and junk fees together, giving "pass through" fees different codes than those set forth in the fee schedules published by the card networks, and listing certain fees as being in the amount of ".00" on monthly statements even though a fee was actually charged and collected as part of aggregated totals listed later on the statements (*id.* at ¶ 100); (d) buried language in prior monthly statements purporting to raise or vary the charges thereby requiring merchants to check all charges not only against the Applications and card network fee schedules, but against all prior statements as well (*id.* at ¶ 101); and (e) insinuated that increases to "pass through" costs had been imposed by the card networks when in reality Defendants concocted them (*id.* at ¶ 109(a)-(c)).

Even if merchants had been able to discover they were being cheated, they could not terminate their relationship with Defendants because of the associated hefty early termination fees. *Id.* at ¶ 93. Merchants were put to a Hobson's Choice – pay the early termination fee or accept the overbilling. *Id.* at ¶ 94.

As a consequence of Defendants' overbilling, Plaintiffs and the proposed class have had excessive and unjust fees seized from their accounts. *Id.* at ¶ 95.

Defendants have attempted to exculpate themselves from liability for their overbilling scheme via the adhesive Terms. *Id.* at ¶ 8. The take-it-or-leave-it Terms consist of small, non-descript font occupying more than 31 single-spaced sections over eight pages. *See* Terms. The subject provisions are buried in Sections 12 and 17, respectively. They are set forth in thick, densely-worded paragraphs and are not prominently distinguished in any manner from other terms (such as via bolded or italicized text). *Id.* So that the Court may view them as did the merchants, the provisions are reproduced below as they appear in the Terms:

**12. LIMITATION OF LIABILITY.**

Neither Member, Global Direct, nor PAI shall be liable for failure to provide the Services if such failure is due to any cause of condition beyond such party's reasonable control. Such causes or conditions shall include, but shall not be limited to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, shortages of labor or materials, freight embargoes, unusually severe weather, breakdowns, operational failures, electrical power failures, communication failures, unavoidable delays, the errors or failures of third party systems, or other similar causes beyond such party's control.

The liability of Global Direct, Member, and PAI for any loss arising out of or relating in any way to this Card Services Agreement, including but not limited to damages arising out of any malfunction of the equipment or the failure of the equipment to operate, the unavailability or malfunction of the Services, personal injury, or property damage, shall, in the aggregate, be limited to actual, direct, and general money damages in an amount not to exceed one (1) month's average charge paid, by Merchant hereunder (exclusive of interchange fees, assessments, and any other fees or costs that are imposed by a third party in connection with Merchant's payment processing) for Services during the previous twelve (12) months or such lesser number of months as shall have elapsed subsequent to the effective date of this Card Services Agreement. This shall be the extent of Global Direct's, Member's, and PAI's liability arising out of or relating in any way to this Card Services Agreement, including alleged acts of negligence, breach of contract, or otherwise and regardless of the form in which any legal or equitable action may be brought against Global Direct, Member, or PAI, whether contract, tort, or otherwise, and the foregoing shall constitute Merchant's exclusive remedy. Under no circumstances shall Global Direct, Member, or PAI be liable for any lost profits, lost interest, or for special, consequential, punitive or exemplary damages arising out of or relating in any way to this Card Services Agreement, including but not limited to, damages arising out of placement of a Merchant's name on any terminated merchant list for any reason, even if Global Direct, Member, or PAI has been advised of the possibility of such damages. Under no circumstances shall Global Direct, Member, or PAI be liable for any settlement amounts pertaining to Switched Transactions; Merchant's recourse therefore shall be applicable to the card issuer.

It is agreed that in no event will Global Direct, Member, or PAI be liable for any claim, loss, billing error, damage, or expense arising out of or relating in any way to this Card Services Agreement which is not reported in writing to Global Direct by Merchant within 60 days of such failure to perform or, in the event of a billing error, within 90 days of the date of the invoice or applicable statement. Merchant expressly waives any such claim that is not brought within the time periods stated herein.

The "written notice provision" – as Defendants call it – is buried under a heading entitled "limitation of liability" consisting of three paragraphs made up of hundreds of words. It describes no less than five distinct concepts. These important provisions could have been set out in their own paragraphs, under their own separate sub-headings, such that attention was drawn to them. Instead, Defendants lumped them all together, with the "written notice provision" far removed from the

heading.  The effect is to draw as little attention as possible.

Section 17 is similarly minimized in size and notoriety:

**17. CHOICE OF LAW/ATTORNEY'S FEES/VENUE/JURY TRIAL WAIVER.**
Should it be necessary for Global, Member or PAI to defend or enforce any of its rights under this Card Services Agreement in any collection or legal action, Merchant agrees to reimburse Global and/or Member and/or PAI, as applicable, for all costs and expenses, including reasonable attorney's fees, as a result of such collection or legal action. Without limiting the generality of the foregoing, Merchant agrees to reimburse Global, Member and/or PAI as applicable, for all costs and expenses, including reasonable attorney's fees, incurred by Global and/or Member and/or PAI in enforcing or defending its rights under this Section 17, without regard to whether there has been an adjudication on the merits in any such action. Merchant waives trial by jury with respect to any litigation arising out of or relating to this Card Services Agreement.  Global, Member, PAI and Merchant agree that any and all disputes or controversies of any nature whatsoever (whether in contract, tort or otherwise) arising out, relating to, or in connection with (a) this Card Services Agreement, (b) the relationships which result from this Card Services Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Card Services Agreement, shall be governed by the laws of the State of Georgia, notwithstanding any conflicts of laws rules, and shall be resolved, on an individual basis without resort to any form of class action and not consolidated with the claims of any other parties. Global, Member, PAI, Merchant agree that all actions arising out, relating to, or in connection with (a) this Card Services Agreement, (b) the relationships which result from this Card Services Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provision of this Card Services Agreement shall be brought in either the courts of the State of Georgia sitting in Fulton County or the United States District Court for the Northern District of Georgia, and expressly agree to the exclusive jurisdiction of such courts.

The heading fails to refer to any class waiver, the section contains many other
provisions, and the waiver is not highlighted in any way.  *Id.*  The waiver,
furthermore, is only one of the onerous clauses designed to shield Defendants from
accountability.  The section also requires a merchant to pay the defense's fees and
expenses *regardless of the outcome of the litigation* and mandates that any suit be
filed in Atlanta, significantly adding to the costs of litigation for most merchants.
Indeed, for Plaintiffs, which are located in California, Wisconsin, and Texas, the
travel costs would exceed their damages.  Dkt. No. 13, ¶ 119.

## ARGUMENT AND CITATION OF AUTHORITY

On motion to dismiss, a court must accept the plaintiff's allegations as true
and construe them in the light most favorable.  *Quality Foods de Centro Am., S.A.
v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983).
A complaint will survive a motion to dismiss if it contains "sufficient factual
matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (cites omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## I.     THE UNJUST ENRICHMENT CLAIM IS VALIDLY PLED.

Plaintiffs' unjust enrichment claim is valid because the unsigned contract never took effect. Further, Defendants' alleged conduct is clearly unjust.

### A.     The Unsigned Agreement Never Took Effect.

If an express condition precedent to formation of a binding contract exists, it "must be performed before the contract becomes absolute and obligatory upon the other party." O.C.G.A. § 13-3-4; *Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1335 (N.D. Ga. 2000). Here, the contract's effectiveness is expressly conditioned upon "acceptance" by Defendants and their member bank: "This Card Services Agreement shall become effective *only upon acceptance* by Global Direct, Member and PAI, or upon delivery of indebtedness at such locations as designated by Global Direct for purchase, whichever event shall occur first." Terms, § 24; *also* Application, p. 3 (merchant is bound by Terms only if

application "is accepted for card service"); *Choate Constr. Co. v. Ideal Elec. Contractors, Inc.*, 246 Ga. App. 626, 629 (2000) (parties can create conditions precedent "by language such as 'on condition that,' 'if' and 'provided,' or by explicit statements that future events are to be construed as conditions precedent").

Here, the only prescribed method for "acceptance" is signature. Indeed, the Application includes a signature block for each of these parties. It states "Signing for Payment Alliance Intl., Inc." then includes "Name (printed):", "Title:", and "Date:". The same blanks are included for "Global Payments Direct, Inc." and "Member." Application, p. 3. The Application further states that the member bank "***must be*** a principal (***signer***) to the Merchant Agreement." *Id.* at 1 (emphasis added). Other provisions incorporate the card network rules, which explicitly require the bank to sign. *Id.* at 1 ("Merchant must comply with Visa Operating Regulations" and referring to "card association rules" as binding); *also* Terms, ¶¶ 14, 16(A); MasterCard Rules, § 7.6.1 (stating that all agreements must be "signed by the Customer," with "Customer" defined to include bank) (Dkt. No. 13-5).

When contracts expressly condition validity on signatures from all parties, courts enforce such language. *E.g.*, *South Atlanta Assocs., Ltd. v. Strelzik*, 192 Ga. App. 574, 575-76 (1989) (refusing to enforce agreement requiring three signatures when only two had signed); *Peacock v. Home*, 159 Ga. 707 (1925) ("When the

intent is manifest that the contract is to be executed by others than those who actually sign it, it is inchoate and incomplete, and does not take effect as a valid and binding contract"). Here, the Application, Terms, and the card network rules condition effectiveness on signatures from Defendants and their member bank. Since signatures were mandatory and such signatures were indisputably not obtained, Plaintiffs have properly alleged that the contract never became binding.[4]

Defendants claim the contract took effect on the occurrence of an alternative event, namely "upon delivery of indebtedness at such locations as designated by Global Direct for purchase." Dkt. No. 24-1, pp. 8-9 (citing Terms, § 24). Defendants interpret this provision to mean that the contract took effect when Plaintiffs submitted "a debt resulting from a credit or debit purchase (of a merchant's good or services) to Global's system" at face value. But this interpretation, at the very least, is incomplete. Such indebtedness must have been delivered at "locations as designated by Global Direct for purchase." *Id.* There is no proof where such indebtedness was delivered.

Moreover, even if the Court were to accept Defendants' interpretation *and* assume that the transactions were submitted from proper locations, the provision is

---

[4] The signature requirement was mutually beneficial, providing assurances to Plaintiffs that they could enforce the contract against Defendants and the bank, and allowing Defendants and the bank the final say over whether they were bound by their agent's decision to potentially contract with Plaintiffs. Dkt. No. 13, ¶ 51.

in direct conflict with the Application and the card network rules, both of which expressly condition effectiveness on signatures and do ***not*** mention any alternative. Also, no action taken by Plaintiffs and Defendants could possibly waive the bank's right (and requirement) to sign. At the very least, these contrary provisions establish ambiguity. *Citrus Tower Blvd. Imaging Ctr., LLC v. Owens*, 325 Ga. App. 1, 6 (2013). Resolution of this ambiguity may require the fact finder to consider parol evidence, most notably evidence as to whether the bank agreed to condition effectiveness on something other than its own signature – a blatant violation of the MasterCard rules that could lead to enormous daily penalties. *See* MasterCard Rules, §§ 7.6.1, 5.1; *also, e.g.*, *Sharple v. AirTouch Cellular of Ga., Inc.*, 250 Ga. App. 216, 218 (2001) (ambiguities create triable issues of fact).

Ignoring such ambiguities and interpreting the subject contract provisions in a vacuum on dismissal would be inappropriate. *E.g.*, *Geter v. Galardi S. Enters., Inc.*, 43 F. Supp. 3d 1322, 1328 (S.D. Fla. 2014) ("the Court 'may not engage in contract interpretation at the motion to dismiss stage, as these arguments are more appropriate for summary judgment'") (quotation omitted); *American Housing Pres. Corp., Mainland Dev. Co. v. NEF Assignment Corp.*, 2015 WL 1419508, *6 (S.D. Ga. Mar. 27, 2015) ("[the movant's] arguments are those of contractual interpretation and unfit for determination at this [motion to dismiss] stage").

Defendants' reliance on *EVO Payments* is not persuasive. Dkt. No. 24-1, pp. 9-10. There, the Court did not consider whether the plaintiff stated a valid claim that the unsigned contract never took effect, but merely made a cursory interpretation of the subject language for the sole purpose of deciding a motion to transfer venue. *EVO Payments*, Slip op. at 4-6 ("The Court is reluctant to engage in lengthy contract interpretation for the purposes of deciding whether transfer is appropriate" and noting that the transferee court would "evaluate these issues and make merits determinations"). This issue was given more thorough consideration in *Liberty Salad, Inc. v. Groundhog Enterprises, Inc.*, No. 17-cv-226 (E.D. Pa. July 7, 2017) (Exh. A hereto). There, a merchant challenged the effectiveness of an unsigned contract that was conditioned on signatures from the processor and its member bank. *Id.* at 2 (noting "[t]he Agreement will not take effect unless and until Merchant has been approved by Bank and IPayment . . ." and "there is a place for the Bank and a separate place for Ipayment to sign showing Approval/Acceptance"). The court held "[c]learly []the Agreement, i.e. the Application and the Program Guide, did not take effect which ends all of Defendant's contract assertions." *Id.* at 2.[5] Because the merchant agreement was

---

[5] The processor subsequently sought clarification and the court reiterated that the agreement plainly required signatures from all parties but they were not obtained and thus it never took effect. *See* July 19, 2017 Letter (Exh. B hereto).

not signed, it (and all of its adhesive provisions) were deemed unenforceable and dismissal of plaintiff's unjust enrichment claim was denied. *Id.* at 3.

Defendants alternatively ask the Court to ignore the undisputed fact that they and the member bank did not sign and instead focus on the fact that the parties proceeded to do business. Dkt. No. 24-1, pp. 11-12. However, while performance can manifest assent in some cases, this general principle is trumped by the specific, plain language of the contract and card network rules. *Shepherd v. Greer, Klosic & Daugherty*, 325 Ga. App. 188, 190 (2013) (general principles trumped by express contract language). None of the cases cited by Defendants, wherein courts enforced unsigned agreements, considered a contract that so repeatedly conditioned effectiveness on acceptance via signature as does the subject contract. Plaintiff has asserted a valid challenge to the effectiveness of the contract.

**B.      Defendants' Alleged Conduct Sustains an Unjust Enrichment Claim.**

If Plaintiffs' challenge to the contract is successful, Plaintiffs may obtain reimbursement of improper fees via the doctrine of unjust enrichment. *J'Carpc, LLC v. Wilkins*, 545 F. Supp. 2d 1330, 1340 (N.D. Ga. 2008) ("In the absence of an enforceable contract, a plaintiff may be able to recover under a theory of unjust enrichment"); *Goldstein v. Home Depot, USA, Inc.*, 609 F. Supp. 2d 1340, 1347 (N.D. Ga. 2008) (allowing alternative pleading when contract challenged).

Defendants claim that if the parties have no contract, it is not "unjust" for them to charge whatever amount they want, in whatever manner they want. Dkt. No. 24-1, pp. 27-28. However, the absence of a binding contract does not authorize one party to cheat another with impunity. *Holland v. Levy Premium Foodservice Ltd. P'ship*, 469 Fed. Appx. 794 (11th Cir. 2012), certainly does not stand for such an inequitable notion. It merely held that the plaintiffs failed to plead facts showing why the defendants' actions were unjust. *Id.* at 797. Here, Plaintiffs have pled multiple facts that establish they have conferred a benefit on Defendants in the form of excessive fees that Defendants equitably ought to return. Dkt. No. 13, ¶¶ 87-109; *also Campbell v. Ailion*, 338 Ga. App. 382, 386 (2016) ("A claim of unjust enrichment will lie if there is no legal contract and the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefited party equitably ought to return"). Issues such as whether it was unjust for Defendants to retain fees procured by secretly inflating "pass through" costs and manipulating junk fees are fact-driven. *E.g.*, *Yoh v. Daniel*, 230 Ga. App. 640, 642 (1998) (whether sums "unjustly inured to [defendant's] benefit is indeed a question of material fact"); *Watson v. Sierra Contracting Corp.*, 226 Ga. App. 21, 27 (1997) (jury must determine value of services in unjust enrichment action). To use Defendants' analogy in the context

of this case, if McDonald's had advertised that the price of soda was "its actual costs + 5%" but subsequently charged customers amounts which consisted of "inflated costs + 7%," a claim for unjust enrichment would most certainly lie.

## II.    THE BREACH OF CONTRACT CLAIM IS VALIDLY PLED.

Plaintiffs' alternative claim for breach of contract is not barred by Defendants' self-serving contractual provisions or the voluntary payment doctrine.

## A.    The Limitation of Liability Provision Does Not Bar Plaintiffs' Claims.

Defendants have concocted a scheme whereby they induce merchants to enroll in their payment processing services with promises of low fees but then proceed to surreptitiously impose markups over the course of the relationship. This conduct is no accident, but is a carefully orchestrated plan to pick merchants' pockets. One of the myriad of ways that Defendants have attempted to immunize themselves from such misconduct is through what they call the "written notice provision." Dkt. Nos. 6-1, p. 3, 24-1, p. 13; *also* Terms, § 12. This label is a misnomer. As Defendants correctly note, a "written notice provision" is to allow parties "to investigate the facts underlying a dispute while they are fresh." Dkt. No. 24-1, p. 13 (quoting *Triad Constr. Co., Inc. v. Robert Half Int'l, Inc.*, 2017 WL 491154, *4 n.6 (11th Cir. Feb. 7, 2017)). Here, such an investigation would serve no purpose because Defendants' overbilling is *intentional* and *systematic*.

Defendants already know they are cheating merchants and thus the provision's sole purpose is to exculpate Defendants from liability if merchants fail to "catch them in the act" soon after the overbilling occurs. The parties should call the provision exactly what the Terms call it – a "limitation of liability" provision. *Id.* at § 12.

Plaintiffs have stated valid challenges to the enforceability of this limitation of liability provision and such claims cannot be resolved without the benefit of discovery. Even if the provision was enforceable, further factual development is needed before the Court can determine whether the provision applies in this case.

**1.** **Plaintiffs' Attacks on Enforceability Are Validly Pled.** The Amended Complaint explains why the limitation of liability provision is unenforceable. Dkt. No. 13, ¶¶ 113-16. These challenges are properly pled.

a. Exculpatory Challenge. Exculpatory clauses are provisions "severely restricting remedies" or "waiv[ing] substantial rights."[6] *Parkside Ctr., Ltd. v. Chicagoland Vending, Inc.*, 250 Ga. App. 607, 611-12 (2001). Here, Defendants purport to *forever bar* merchants that do not immediately discover and report Defendants' intentional overbilling from *ever* seeking relief. Terms, § 12

---

[6] *See also* John Hutchins & Christopher Wiech, *Your Clients' Contracts Shouldn't Bury Limitation of Liability Clauses in the Fine Print*, Ga. Bar Journal, Aug. 2015, pp. 11-16 (briefing Georgia law on exculpatory clauses) (Exh. C hereto).

("Merchant expressly waives any such claim that is not brought within the time periods stated . . .").  This is an exculpatory clause under Georgia law.[7]

"[E]xculpatory clauses will not preclude a claim based on willful and wanton misconduct."  *Neighborhood Assistance Corp. v. Dixon*, 265 Ga. App. 255 (2004); *see also Holmes v. Clear Channel Outdoor, Inc.*, 284 Ga. App. 474, 477 (2007).  Because Plaintiffs allege Defendants have intentionally overcharged merchants, the provision cannot be enforced to bar such claims.  Georgia courts do not allow parties to contractually relieve themselves from liability for intentional acts.  *See, e.g.*, *McCann v. Sky Warriors, Inc.*, 268 Ga. App. 750, 758-59 (2004) (exculpatory clause void if defendant acted willfully and wantonly and nature of conduct was question of fact for jury); *Colonial Props. Realty Ltd. P'ship v. Lowder Constr. Co.*, 256 Ga. App. 106, 112 (2002).

An exculpatory clause must also be "explicit, prominent, clear and unambiguous."  *Holmes*, 284 Ga. App. at 477.  In determining whether this high standard is met, courts consider several factors, including but not limited to

---

[7] Plaintiffs have not located a reported Georgia decision that has considered whether a similar limitation of liability qualified as an exculpatory clause.  At least one state court, however, has ruled that such a provision is an exculpatory clause. *E.g.*, *Novak & Co. v. N.Y. Housing Auth.*, 480 N.Y.S.2d 403, 408 (N.Y. App. Div. 1984) (analogizing contractual notice provisions to provisions shortening statutes of limitations and holding that both are exculpatory clauses designed to limit liability with the difference being "merely one of draftsmanship").

"whether the clause is contained in a separate paragraph, whether the clause has a separate heading, and whether the clause is distinguished by features such as font size." *Chicagoland Vending*, 250 Ga. App. at 611. Courts routinely invalidate exculpatory clauses that are not distinguished from other terms.[8]

Here, we are not dealing with a short, two-page contract, but rather one occupying eight pages and consisting of more than 31 sections, with many of the sections containing multiple paragraphs that describe varied concepts. *See* Terms. The Terms consist of tiny, single-spaced, unbolded, unitalicized, and uncapitalized font and the limitation of liability provision is buried in the middle of the 12th section, which consists of three paragraphs and eight dense sentences that describe multiple concepts. The provision is clearly intended to, and does, draw as little attention as possible. It cannot be characterized as explicit, clear, or prominent.

---

[8] *E.g.*, *Monitronics Int'l, Inc. v. Veasley*, 323 Ga. App. 126, 135-36 (2013) (uncapitalized limitation of liability clause printed on the reverse side of a single-page contract and not set forth in its own sub-paragraph but instead "written in the same small, single-spaced typeface as the majority of the contract" was unenforceable*)*; *Allstate Ins. Co. v. ADT, LLC*, 2015 WL 5737371, *5 (N.D. Ga. Sept. 30, 2015) (limitation of liability clause in business contract printed "in extremely small print and single spaced" under bolded heading "LIMITATION OF LIABILITY" after several other provisions such that it was "far removed from th[e] heading" was unenforceable); *JVC Am., Inc. v. Guardsmark, LLC*, 2006 WL 2443735, *4-5 (N.D. Ga. Aug. 22, 2006) (exculpatory clause on the reverse side of a two-page business contract in paragraph with several other provisions, printed in small print and single-spaced, without any bold typeface was unenforceable).

Thus, Plaintiffs have properly alleged that the clause does not bar their claims.[9]

        b.    <u>Unconscionability.</u>  Courts refuse to enforce contract provisions that were unconscionable at the time the contract was made. *NEC Techs., Inc. v. Nelson*, 267 Ga. 390, 391-93 (1996); O.C.G.A. § 11-2-302. The unconscionability analysis consists of a two-pronged inquiry into the procedural and substantive unconscionability of the provision and generally requires that "a certain quantum of" both be present for the provision to be deemed unenforceable. *Id.* at 394 n.6.

     As for procedural unconscionability, courts examine "the making of the contract" and focus on "the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *Id.* at 392; *also Mullis v. Speight Seed Farms, Inc.*, 234 Ga. App. 27, 30 (1998) (procedural element examines whether there is "oppression" in the form of a lack of negotiation and "surprise" such that the subject terms "are hidden in a prolix printed form drafted by the

---

[9] Defendants ignore the covert formatting of the clause and claim that it is nonetheless enforceable because they also buried self-serving language in the adhesive Applications that the merchants "read, underst[ood], and agree[d] to be bound by the [Terms]." Dkt. No. 24-1, p. 20. But similar form language appeared in the contracts at issue in *ADT* and *Guardsmark*. This did not stop Judges Duffey and Forrester from invalidating the clauses that the plaintiffs affirmed they "received, read, and understood," "understand and accept," and "agree[]" to. *See* ADT Contract (Exh. D hereto); Guardsmark Contract (Exh. E hereto).

[stronger] party"). Here, the process by which Defendants "made" their contract with Plaintiffs is unconscionable. Dkt. No. 13, ¶¶ 18-24 (noting bargaining power disparity), 115 (explaining in detail why procedurally unconscionable, including adhesive nature, inability to negotiate or opt-out, inconspicuous presentation, formatting, etc.); *also Mullis*, 234 Ga. App. at 30 (clause that was not negotiated or explained by stronger party but was hidden in fine print terms procedurally unconscionable); *Billingsley v. Citi Trends, Inc.*, 948 F. Supp. 2d 1287, 1295 (N.D. Ala. 2013) (finding clause procedurally unconscionable under Georgia law because it was presented in a fashion that gave the plaintiffs no meaningful choice).

Defendants reassert their claim that because the form contract included the "affirmation" of Plaintiffs that they read and understood the terms, the limitation of liability clause cannot be procedurally unconscionable. Dkt. No. 24-1, pp. 18-19. However, the presence of such self-serving language in a contract of adhesion has not stopped courts from finding procedural unconscionability. *E.g.*, *Antonelli v. Finish Line, Inc.*, 2012 WL 525538, *4 (N.D. Cal. Feb. 16, 2012); *Price v. Chrysler LLC*, 2009 WL 2208298, *1-3 (E.D. Miss. July 23, 2009).

Defendants also argue that Plaintiffs were not forced to do business with them and could have contracted with other processors. Dkt. No. 24-1, pp. 19-20. However, the circumstances surrounding what alternative processors were

available to Plaintiffs (including whether they could have entered a contract without a similar limitation of liability provision) has not been determined. These are obvious issues of fact. Moreover, Plaintiffs' procedural unconscionability claim rests on more than just unequal bargaining power. Dkt. No. 13, ¶ 115.

"[S]ubstantive unconscionability looks to the contractual terms themselves." *NEC Techs.*, 267 Ga. at 392. Courts focus on "matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* Generally, an unconscionable contractual provision is one that "no sane man not acting under a delusion would make, and that no honest man would take advantage of." *Hall v. Wingate*, 159 Ga. 630 (1925). Defendants argue that the limitation of liability provision cannot be substantively unconscionable because courts routinely enforce similar provisions. Dkt. No. 24-1, pp. 17-18. But this provision is different. It purports to **completely bar** a merchant that does not immediately discover and report Defendants' misconduct (be it negligent or intentional) from **ever** pursuing a claim. *See* Terms, § 12 ("**in no event** will [Defendants] be liable for any claim . . . which is not reported in writing . . . within 60 days of such failure to perform . . . Merchant **expressly waives any such claim** that is not brought within the time periods stated herein") (emphasis added). By its own explicit

terms, the clause purports to bar recovery for intentional misconduct, including that which was actively concealed. Dkt. No. 13, ¶¶ 98 (Defendants failed to send statements itemizing overcharges), 100-04 (overcharges concealed in statements that are extraordinarily difficult to understand), 109-12 (misleading messages regarding overbilling provided). The clause purports to create an absolute bar and leaves no "wiggle room" for equitable tolling. Terms, ¶ 12. No honest man would expect another to "eat" their losses if Plaintiffs' allegations are proven, nor would a sane man agree to such a restriction. *E.g.*, *Gleike Taxi, Inc. v. Challenger Cab, LLC*, 2016 WL 1450048, *7-8 (N.D. Ill. April 13, 2016) (agreement substantively unconscionable in part because it imposed notice requirement on weaker party).

Defendants' position is directly contrary to their own counsel's prior arguments. In *Manjunate Gokari, P.C. v. Federal Express Corp.*, Case No. 2:11-CV-2131-BBD-CGC (W.D. Tenn.) ("*FedEx*"), counsel for Global represented a merchant in a class action claiming that FedEx was overbilling. *See FedEx* Brief, p. 1 (Exh. F hereto).[10] FedEx moved to deny class certification before discovery had taken place, citing merchants' alleged failure to comply with a similar provision requiring notice. Counsel for Global responded by arguing that the provision was unconscionable because requiring notice for each of the defendant's

---

[10] Mr. Rosenwasser, though not listed on the brief, was an attorney for the plaintiffs in the *FedEx* litigation. *See* Docket (Exh. G hereto).

intentional, systematic overcharges would produce "a ludicrous result" that would destroy the purpose of the class action. *Id.* at 13-14 ("If FedEx can require that every class member submit individual notice for each invoice containing an improper surcharge, then FedEx can achieve through notice requirements what it cannot achieve directly: a prohibition of class actions"). Under counsel for Global's logic, the unconscionability challenge is validly pled.

        c.      <u>Enforceability Hinges on Factual Issues.</u>  Typically, a court decides whether a contractual provision violates public policy or is unconscionable on summary judgment, not at the pleading stage. *E.g.*, *NEC Techs.*, 267 Ga. at 391-93; *Monitronics*, 323 Ga. App. at 135-36. That makes sense because the decision often turns on factual issues. For instance, whether a clause is exculpatory depends on whether it "severely restricts remedies," and whether the clause is unconscionable depends on the parties' relative bargaining power, the presence or absence of a meaningful choice, whether the clause allows "unchecked market behavior," the fairness of the provisions, etc. *E.g.*, *Dale*, 498 F.3d at 1224. Resolution of Plaintiffs' fact-intensive challenges should await discovery. *E.g.*, *FedEx* Order, p. 2 (adopting counsel for Global's position, holding "the issue of whether the applicable contract provisions are unconscionable is subject to review by the Court in the context of the factual circumstances of the case, which cannot

be gleaned from the existing record") (Exh. H hereto).

**2. Interpretation of the Limitation of Liability Provision Is Premature.** The provision purports to relieve Defendants of liability "for any claim, loss, billing error, damage or expense [related to the Agreement] which is not reported in writing to Global Direct by Merchant within 60 days of such failure to perform or, in the event of a billing error, within 90 days of the date of the invoice or applicable statement." Terms, § 12. Defendants argue that this limitation of liability provision clearly bars Plaintiffs' claims. But this is far from a settled issue. For instance, what does the term "failure to perform" cover? Here, Plaintiffs do not allege losses related to any "failure to perform" by Defendants, but rather losses based on their *intentional* misconduct. This, of course, is an issue of contract interpretation that is inappropriate to resolve on motion to dismiss. *E.g.*, *Geter*, 43 F. Supp. 3d at 1328; *American Housing*, 2015 WL 1419508 at *6. If the court does wade into such issues, any ambiguities in the provision must be resolved against Defendants. *Monitronics*, 323 Ga. App. at 135.

However, even if it is presumed that the provision covers Defendants' actions, the question remains as to whether any delay on the part of Plaintiffs in providing such notice is justified. *E.g.*, *Triad*, 2017 WL 491154 at *1-3 (delay in providing notice justified until party discovered misconduct); *Eells v. State Farm*

*Mut. Auto. Ins. Co.*, 324 Ga. App. 901, 903 (2013) (party charged with providing notice should have opportunity to provide justification for delay). This is an issue of fact.[11] *Eells*, 324 Ga. App. at 903-04 ("'the adequacy of the notice and the merit of [the contracting party's] claim of justification are ones of fact which must be resolved by a jury as they are not susceptible to being summarily adjudicated as a matter of law'") (quotation omitted); *also OneBeacon Am. Ins. Co. v. Catholic Diocese of Savannah*, 477 Fed. Appx. 665, 670-71 (11th Cir. 2012) (same); *Progressive Mt. Ins. Co. v. Bishop*, 338 Ga. App. 115, 118-19 (2016) (same).

Here, Plaintiffs have given multiple justifications for any delay in providing written notice. Dkt. No. 13, ¶¶ 98 (Defendants failed to send statements itemizing overcharges), 100-04 (overcharges concealed in extremely difficult to understand statements), 109-12 (misleading messages regarding overbilling). Defendants took action to preclude Plaintiffs from discovering the overcharges at issue. *Id.*

If any or all of these facts are proven, Plaintiffs will have justified their failure to provide timely notice. *Eells*, 324 Ga. App. at 904. Moreover, if the Court were to find that Defendants affirmatively concealed the overcharges from

---

[11] The clock most certainly did not start ticking within "90 days of the date of the invoice or applicable statement," as such time period is expressly only applicable to "billing errors." Here, we are not dealing with alleged "errors" (such as the failure to credit a transaction or a mistake between the true transaction and the statement) but rather intentionally orchestrated overcharges. Dkt. No. 13, ¶ 107. The 90-day time limit is thus clearly inapplicable.

Plaintiffs, Defendants would be barred from enforcing the alleged notice provision. *E.g.*, *Georgia 20 Props. LLC v. Tanner*, 255 Ga. App. 6, 10 (2002) ("A party cannot avoid the obligations of a contract by frustrating the performance of a condition precedent"). Defendants' claim that Plaintiffs could never, under any set of circumstances, justify their failure to discover and report the subject overcharges is simply not true. *Asplundh Tree Expert Co. v. Emeritis LLC*, 2006 WL 1794744, *2, n.5 (N.D. Ga. June 27, 2006) (rejecting motion to dismiss because of factual issues surrounding compliance with provision requiring pre-suit notice).

**B.      The Class Waiver Is Unenforceable.**

Defendants seek to enforce the class waiver that is buried in the Terms. Dkt. No. 24-1, pp. 20-26. Before Plaintiffs explain why the waiver is unenforceable, here are the arguments of Global's counsel in the *FedEx* case:

> FedEx's prohibition of class actions ***is unenforceable because it is unconscionable***. A class action is the only viable remedy for FedEx's systemic imposition of improper surcharges . . . The average class member's damages are [] small . . . . The filing fee alone will far exceed the possible recovery, without even considering the cost of an attorney . . . . Because a class action is the only real remedy, FedEx's prohibition of class actions is essentially ***a broad and absolute exculpatory clause***. It allows FedEx to escape liability for all types of improper surcharges, not just [those at issue]. While each individual customer may only lose a small amount of money, "[a] company which wrongfully exacts a dollar from each of millions of customers will reap a handsome profit; the class action is often the only effective way to halt and redress such exploitation." [citations omitted].

*See FedEx* Brief, pp. 5-6 (emphasis added).  This position, of course, is directly contradictory to that taken by Global and the other Defendants in this case.

1.    **Exculpatory Challenge.**  If Plaintiffs are forced to seek relief on an individual basis, it would make no economic sense for them to proceed.  Because the contract purportedly does not allow Plaintiffs to recover attorneys' fees if their claims are vindicated, limits what Plaintiffs can recover, and requires Plaintiffs to pay other parties' legal fees and costs regardless of the outcome (Terms, § 17), the costs of litigating the case to conclusion would far outweigh the potential damages at stake.  Thus, the only practical way to remedy Defendants' small-value overbilling is by a class action.  *See generally Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.").  Thus, and as Global's counsel and the Eleventh Circuit have previously noted, a class action waiver can be an exculpatory clause.  *See FedEx* Brief, pp. 5-6; *Dale*, 498 F.3d at 1224 ("Corporations should not be permitted to use class action waivers to *exculpate* themselves from liability for small-value claims") (emphasis added).  Indeed, it "severely restrict[s] remedies" *and* "waives substantial rights."  *Parkside Ctr.*, 250 Ga. App. at 611-12.

Defendants argue that the waiver is not an exculpatory clause because it

does not restrict Plaintiffs' remedies or substantive rights, but only prohibits Plaintiffs from using a procedural device.[12] Dkt. No. 24-1, p. 25. However, the alleged distinction is one without a difference. Whether labeled substantive or procedural, the waiver is outcome-determinative because, if it is enforced, Plaintiffs will have no remedy – the exact result that Georgia law means to prevent.

As an exculpatory clause, the class action waiver at issue is unenforceable if it either (a) immunizes willful and wanton conduct or (b) was hidden in the fine print, rather than being prominently displayed. *See supra*, pp. 16-18. Here, both criteria are met. *Id.* Indeed, the clause would not only immunize Defendants from ever having to answer for their willful overbilling but is intentionally buried deep in the fine print and formatted to draw as little attention as possible. Terms, § 17. For instance, the waiver is not capitalized, italicized, bolded, or otherwise set off to alert the reader to its importance. The waiver is not even mentioned in the title of the section, which lists the other concepts described in the section. It is not even set out in its own sentence, but is a run-on clause at the conclusion of the choice of

---

[12] Defendants rely upon dicta from *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013). That case is clearly distinguishable both on its facts and the law. There, the Court construed the Federal Arbitration Act ("FAA") and enforced the arbitration clause at issue despite the plaintiffs' argument that the costs of proving their antitrust claim made individual arbitration economically infeasible. 133 S. Ct. at 2311. This case does not involve an antitrust claim, arbitration clause, or the FAA, but raises an entirely different question, namely whether a standalone class action waiver is exculpatory under Georgia law.

law provision.  *Id.*  As was the case in *Chicagoland Ventures*, *Monitronics*, *JVC*, and *Allstate*, the waiver cannot be characterized as "explicit, clear, or prominent" and thus violates public policy and is unenforceable.

2. **Unconscionability.**  Plaintiffs' unconscionability challenge to the waiver is also validly pled.  The clause is procedurally unconscionable for the same reasons that the limitation of liability clause is procedurally unconscionable. *See supra*, pp. 18-20.  The clause is substantively unconscionable because given the small amounts at stake on an individual basis, the inability of merchants to recover their attorneys' fees, and the other exculpatory provisions in the contract, the waiver effectively bars merchants from ever successfully vindicating their legal claims.  Dkt. No. 13, ¶¶ 124-25.  The controlling case in this Circuit is *Dale*.  In *Dale*, cable television subscribers filed a class action against Comcast for overbilling in violation of federal law.  498 F.3d at 1220.  Comcast sought to compel arbitration on an individual basis in reliance on a contractual class action waiver.  The plaintiffs alleged the waiver was unconscionable under Georgia law because, given the small potential recovery when compared to the costs of arbitration, the waiver "allow[s] Comcast to continue unabated its alleged practice of overcharging customers."  *Id.* at 1220.  The Eleventh Circuit agreed, explaining:

> Without the benefit of a class action mechanism, the subscribers would effectively be precluded from suing Comcast for a violation of

> 47 U.S.C. § 542. The cost of vindicating an individual subscriber's claim, when compared to his or her potential recovery, is too great. Additionally, because the Cable Act does not provide for the recovery of attorneys' fees or related costs for the violations alleged by the subscribers, and because state law allows fees and costs to be awarded only where bad faith is shown, it will be difficult for a single subscriber to obtain representation. This will allow Comcast to engage in unchecked market behavior that may be unlawful. Corporations should not be permitted to use class action waivers as a means to exculpate themselves from liability for small-value claims.

*Dale*, 498 F.3d at 1224.[13]

Other courts routinely deem class action waivers to be unconscionable under such circumstances. *See, e.g., Jones v. Direc-TV, Inc.,* 381 Fed. Appx. 895, 896-97 (11th Cir. 2010) (a class action waiver "is unconscionable under Georgia law when the 'cost of vindicating an individual [class member's] claim . . . is too great'") (quoting *Dale); Chalk v. T-Mobile USA, Inc.*, 560 F.3d 1087, 1096-98 (9th Cir. 2009); *Homa v. American Express Co.*, 558 F.3d 225, 233 (3d Cir. 2009); *Kristian v. Comcast Corp.*, 446 F.3d 25, 57-59 (1st Cir. 2006).

The argument for unconscionability here is as strong, if not stronger, than in

---

[13] No court has questioned the continued validity of the Eleventh Circuit's analysis of class waivers in *Dale* after *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011). That is because *Concepcion* had nothing to do with standalone class waivers, but instead with arbitration agreements (with or without attendant class waivers) governed by the FAA. The FAA and cases construing it have no relevance here. *See FedEx* Brief, pp. 10-11 (arguing *Concepcion* inapplicable for the same reason).

*Dale* and the other cited cases. Plaintiffs have no ability to recover their legal fees and expenses; indeed, Defendants' contracts require Plaintiffs to pay defense fees and costs even if Plaintiffs prevail. Terms, § 17. Because the cost of vindicating Plaintiffs' claims on an individual basis dwarfs the potential recovery, enforcing the class action waiver would permit overbilling to continue unchecked.[14]

Defendants' cited cases do not support their substantive unconscionability argument. *Palmer v. Convergys* distinguished *Dale* because the individual claim did not involve minor damages. 2012 WL 425256, *7 (M.D. Ga. Feb. 9, 2012). The remaining cases were not decided pursuant to Georgia law and, in any event, unconscionability was evaluated *after* the plaintiffs were given an opportunity to take discovery at class certification (*e.g.*, *Korea Week, Inc. v. GOT Capital, LLC*, 2016 WL 3049490 (E.D. Pa. May 27, 2016)) or summary judgment (*e.g.*, *U1it4Less, Inc. v. FedEx Corp.*, 2015 WL 3916247 (S.D.N.Y. June 25, 2015)). *See* Dkt. No. 24-1, pp. 21-24; *also FedEx* Order, p. 2 (unconscionability ruling should await discovery). Plaintiffs' challenge to the class waiver is validly pled.

## III.   THE VOLUNTARY PAYMENT DOCTRINE IS INAPPLICABLE.

Defendants argue Plaintiffs' claims are barred because they voluntarily paid

---

[14] That Plaintiffs are small businesses rather than consumers does not change the result. Indeed, the class that counsel for Global represented in *FedEx* was a putative class *of merchants*. *See FedEx* Brief, pp. 1-2.

the charges they now seek to dispute. Dkt. No. 24-1, p. 29. However, a prerequisite to the application of the voluntary payment doctrine is full knowledge of all material facts. O.C.G.A. § 13-1-13 (payment is voluntary "where all the facts are known"). Plaintiffs have set forth in great detail why their payments were not made voluntarily or with full knowledge, including because Defendants failed to send statements describing the charges; for statements that were sent, Defendants seized the amounts from Plaintiffs' account before they had an opportunity to review and understand them (let alone protest); the form, formatting, and content of the statements did not enable Plaintiffs to determine whether or how they are being overcharged, etc. Dkt. No. 13, ¶¶ 97-105. These allegations are more than sufficient to substantiate Plaintiffs' lack of full knowledge. *E.g.*, *Eco Solutions, LLC v. Verde Biofuels, Inc.*, 2011 WL 13135785, *23 n.20 (N.D. Ga. Sept. 21, 2011) (rejecting defense because there was evidence that payor did not have full knowledge of material facts when payments were made); *CLN Props., Inc. v. Republic Servs., Inc.*, 688 F. Supp. 2d 892, 899 (D. Ariz. 2010) (application of Georgia voluntary payment doctrine could not be resolved at pleading stage because payor alleged it lacked full knowledge).

Defendants ignore these allegations and claim that because Plaintiffs' counsel has figured out some of the overcharges, the merchants could have done so

before Defendants automatically debited their accounts. Dkt. No. 24-1, p. 29. However, even if it can be assumed that Plaintiffs had access to the same resources and industry experts *and* had the duty to perform this onerous investigation in response to each and every monthly statement, failure to do so before paying the subject amounts was, at worst, due to negligence or a lack of diligence. Payments made under such circumstances can be recovered because it would not prejudice Defendants, which collectively make billions in revenue per year, to return the overcharges. *Gulf Life Ins. Co. v. Folsom*, 256 Ga. 400, 402-06 (1986) ("a plaintiff generally can recover a payment mistakenly made when that mistake was caused by his lack of diligence or his negligence in ascertaining the true facts and the other party would not be prejudiced by refunding the payment – subject to a weighing of the equities between the parties by the trier of fact").

## CONCLUSION

Plaintiffs have stated valid unjust enrichment and breach of contract claims and thus dismissal should be DENIED. Moreover, the Court should decline Defendants' procedurally improper invitation to limit the scope of discovery. Dkt. No. 24-1, p. 30. The parties have agreed to meet and confer on discovery after the Court rules on this motion and the Court has approved this procedure. Dkt. No. 18, p. 12; Dkt. No. 19. Any ruling on the scope of discovery should wait.

DATED this 4th day of August, 2017.

Respectfully submitted,

BY:   WEBB, KLASE & LEMOND, LLC

 */s/ E. Adam Webb*
E. Adam Webb
  Georgia Bar No. 743910
Matthew C. Klase
  Georgia Bar No. 141903

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 217-9950 (fax)
Adam@WebbLLC.com
Matt@WebbLLC.com

*Attorneys for Plaintiffs*

## TYPE AND FONT CERTIFICATION

The undersigned certifies that this brief complies with Local Rule 5.1(B) regarding typefaces and fonts.

*/s/ E. Adam Webb*
E. Adam Webb


## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of August, 2017, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

*/s/ E. Adam Webb*
E. Adam Webb